**OKIN, HOLLANDER & DeLUCA, L.L.P.**
One Parker Plaza
Fort Lee, New Jersey 07024
(201) 947-7500
Paul S. Hollander (PH-2681)
Attorneys for Manyfoods, Inc., Debtor*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re:<br><br>**MANYFOODS, INC.**<br><br>Debtor and Debtor-in-Possession. | Chapter 11<br><br>Case No. 03-27989 (DHS) |

**VERIFIED STATEMENT OF PETER OFFERMANN IN SUPPORT OF**
**APPLICATION PURSUANT TO 11 U.S.C. § 327(a) AND FED. R. BANKR. P. 2014(a)**
**FOR ORDER AUTHORIZING AND APPROVING EMPLOYMENT OF**
**HT CAPTIAL ADVISORS, LLC AS SPECIAL FINANCIAL ADVISORS TO**
**THE DEBTOR AND DEBTOR-IN-POSSESSION NUNC PRO TUNC**

PETER OFFERMANN, being of full age and under of penalty of perjury, makes and verifies the following statement:

1.  I am a Managing Director of HT Capital Advisors, LLC ("HT Capital"), a private investment banking firm head-quartered in New York, New York. I make this verified statement in support of the application of Manyfoods, Inc, the above-captioned debtor and debtor-in-possession (the "Debtor"), for an order authorizing the Debtor's employment of HT Capital, pursuant to 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014(a), as special financial advisors to the Debtor in this Chapter 11 case. Unless otherwise noted, I base this verified statement on my

---

* An application for an order authorizing and approving the employment of Okin, Hollander & DeLuca, L.L.P. as counsel to the Debtor and Debtor-in-Possession is pending.

personal knowledge, my review of relevant documents regarding this matter and my discussions with Debtor's counsel.

2. HT Capital began assisting the Debtor pre-petition and is prepared to continue its assistance to the Debtor during the post-petition period. The Debtor has selected HT Capital because of its experience in matters of this character, particularly in the food and beverage industry, and its qualifications to perform the services required in this case. The Debtor believes that the retention and employment of HT Capital is in the best interests of the Debtor's estate and its creditors.

3. HT Capital is well qualified to serve as special financial advisors to the Debtor. HT Capital is a private investment banking firm, head-quartered in New York City. Established over 50 years ago, its clientele consists primarily of emerging and established middle market companies throughout the United States and internationally. HT Capital provides a full range of corporate financing services, including, but not limited to, valuations and fairness opinions, private placement financing and recapitalizations. HT Capital has experience in providing reorganization and advisory services for bankrupt debtors (as well as equity and creditor committees of bankrupt companies). HT Capital's Food & Beverage Group focuses exclusively on meeting the needs of middle market food and beverage companies from the restructuring of troubled situations, including institutional private placements of debt and equity capital, to the sale, merger or acquisition of a business. HT Capital enjoys an exceptional track record of successful transactions encompassing most segments of the industry from food processors and beverage producers to supermarkets and restaurant chains.

F:\OCH\ManyFoods\Pldgs\Affidavit Employ HT Capital.doc

4. I have been and will continue to be the primary financial advisor to the Debtor. I am a member of the National Association of Corporate Directors and the Turnaround Management Association. I have 35 years of experience advising, financing, managing and operating middle market businesses. Attached hereto as Exhibit "B" is brief professional bio regarding my background and my *curriculum vitae*.

5. Prior to the Petition Date, the Debtor engaged HT Capital to provide the following assistance, the nature of which the Debtor expects would continue post-petition: (a) assist management in evaluating the Debtor, its financial situation and its business prospects; (b) assist management in developing a business and financial plan; (c) assist management in developing a strategy for negotiating with various creditors and creditor constituencies; (d) assist management in negotiations with such creditors and creditor constituencies; and (e) provide such other related services as may be agreed upon between HT Capital and the Debtor. In addition, the Debtor expects that HT Capital will assist the Debtor's bankruptcy counsel in preparing those various pleadings that are likely to be filed in order to effectuate the Debtor's business plan.

6. The Debtor is the owner and operator of three (3) retail supermarkets that operate under the Foodtown cooperative banner. The Debtor's retail stores are located in Cedar Knolls, Wanaque and River Vale, New Jersey. The Debtor is also the owner and operator of a retail liquor store located in Cedar Knolls, New Jersey. The Debtor operates its retail supermarkets and liquor store from premises leased from various third party lessees. The Debtor employs more than 200 full and part time employees. The Debtor's retail supermarkets carry a full line of national branded and private label grocery, bakery, deli, dairy, produce, meat/poultry/fish, frozen foods, health/beauty products and general merchandise items. The Debtor's retail liquor store

carries a full line of wine, liquor, spirits, cigarettes and other beverages. As of the Petition Date, the Debtor maintained an aggregate inventory, valued on a cost basis, of approximately $2,100,000.

7. In my opinion, it would advisable that the Debtor retain the services an experienced financial advisor to assist the Debtor in consummating a financial restructuring that will be satisfactory to the Debtor's estate, its creditors and the Court. Of immediate needs, HT Capital, among other things, would assist the Debtor in negotiating a financing agreement to replace the Debtor's existing bank debt.

8. HT Capital has undertaken a detailed search of available information to determine and to disclose whether it is performing or has performed services for any significant creditors, equity security holders or insiders in such unrelated matters. Based on such search, and to the best of the HT Capital's knowledge, information and belief, HT Capital is not related to or connected with, and neither holds nor represents any interest adverse to, the Debtor, its estate, its creditors, any other party in interest in this Chapter 11 case, the Debtor's attorneys, the United States Trustee or anyone employed in the Office of the United States Trustee in the matters for which HT Capital is proposed to be employed (except HT Capital's connection with the Debtor by virtue of this engagement). HT Capital may represent or have represented certain of the Debtor's creditors or other parties in interest, or interests adverse to such creditors or other parties in interest herein, in matters unrelated to this Chapter 11 case. Personally, while employed as a Managing Director with Bankers Trust Company, in or about 1990 to 1991, I advised on the restructuring of Di Giorgio Corporation. The White Rose Foods division of Di

Giorgio Corporation is currently a large unsecured creditor of the Debtor and the Debtor is currently negotiating the terms of debtor-in-possession financing from White Rose.

9. Prior to the Petition Date, HT Capital received a retainer in the amount of $15,000.00 in accordance with the terms and conditions of the engagement letter between the Debtor and HT Capital, a copy of which is annexed hereto as Exhibit "A." In addition, HT Capital billed the Debtor prior to the Petition Date a total of $34,387.00 for services rendered, against which HT Capital received payment from the Debtor prior to the Petition Date in the amount of $17,412.00. After application of the retainer, HT Capital has a balance due and owing from the Debtor as of the Petition Date in the amount $1,975.00; however, in order to satisfy the "disinterested person" standard under the Bankruptcy Code and Bankruptcy Rules, HT Capital has agreed to waive any claim in this Chapter 11 case with respect to the $1,975.00.

10. Based on the foregoing, HT Capital believes it is a "disinterested person," as such term is defined in Bankruptcy Code Section 101(14) and as required by Section 327(a) and Fed. R. Bankr. P. 2014(a).

11. HT Capital will promptly update any material developments regarding the Debtor any other pertinent relationships that require disclosure in this Chapter 11 case if and when any such developments or relationships come to HT Capital's attention.

12. HT Capital has agreed to provide assistance to the Debtor in accordance with the terms and conditions which are set forth in the engagement letter annexed hereto as Exhibit "A." The terms of HT Capital's compensation and reimbursement of expenses for its services are set forth in the engagement letter; _provided_, _however_, HT Capital has agreed that paragraphs 3 and 4 of the engagement letter would amended by the order granting the Debtor's Application such that

no payment of compensation or reimbursement of expenses would be made by the Debtor to HT Capital without a prior order entered by the Court in this Chapter 11 case pursuant to Bankruptcy Code Sections 330, 331 and 503(b).

13. HT Capital's decision to accept this engagement to provide financial advice to the Debtor is contingent upon its ability to be retained in accordance with its customary terms and conditions of employment and compensated for its services and reimbursed for the out-of-pocket expenses it incurs in accordance with its customary billing practices.

14. HT Capital understands and accepts that the terms of its employment must be approved by the Court and that the fees it ultimately will receive will be allowed by the Court and will depend on, among other things, the quality of its work. However, HT Capital would prefer to resolve at this time any objections by the Court or other parties in interest to its billing practices, including its billing rates and methods of charging expenses.

15. HT Capital requests that its retention be approved *nunc pro tunc* to date that this Chapter 11 case commenced. HT Capital has rendered services to the Debtor in connection with the commencement of this Chapter 11 case and in connection with the negotiations of a financing agreement to replace the Debtor's existing bank debt, among other things. Such services could not be avoided or delayed. Under such circumstances, the Third Circuit has held that the Court may, in the exercise of its broad equity power, authorize retroactive retention. See Matter of Arkansas Co., Inc., 798 F.2d 645, 650 (3d Cir. 1986).

**I hereby verify, under penalty of perjury, that the statements made herein are true and correct.**

/s/  Peter Offermann
Peter Offermann
Managing Director, HT Capital Advisors, LLC

Dated:  June 11, 2003

Debtor:    Manyfoods, Inc.

Case No.:    03-27989 (DHS) (Chapter 11)

EXHIBITS to VERIFIED STATEMENT OF PETER OFFERMANN IN SUPPORT OF APPLICATION PURSUANT TO 11 U.S.C. § 327(a) AND FED. R. BANKR. P. 2014(a) FOR ORDER AUTHORIZING AND APPROVING EMPLOYMENT OF HT CAPTIAL ADVISORS, LLC AS SPECIAL FINANCIAL ADVISORS TO THE DEBTOR AND DEBTOR-IN-POSSESSION <u>NUNC</u> <u>PRO</u> <u>TUNC</u>

# Exhibit A

# HT CAPITAL ADVISORS, LLC

PERSONAL & CONFIDENTIAL

May 7, 2003

Mr. William A. Louttit, President
Manyfoods, Inc.
Pine Plaza – 831 B State Highway #10
Whippany, NJ 07981

Dear Bill:

The Agreement confirms the engagement of HT Capital Advisors, LLC. ("HT") by Manyfoods, Inc. (the "Company") to advise the Company in connection with a Financial Restructuring, as defined below.

1. Services to be Rendered – HT agrees to work with the Company in attempting to consummate a Financial Restructuring which will be satisfactory to the Company's creditors and shareholders, including, if appropriate, effecting the Financial Restructuring through the use of the U.S. Bankruptcy Code. In completing this assignment, HT will perform such of the following financial advisory services as the Company may reasonably request: (1) Assist the management of the Company in evaluating the Company, its financial situation, and its business prospects, (2) Assisting management of the Company in developing a business and a financial plan, (3) Assisting management in developing a negotiating strategy for dealing with various creditor constituencies (4) Assisting management of the Company in face to face negotiations with creditor constituencies, including bank, trade, other creditors and note-holders, and (5) such other advisory services as may be agreed upon by HT and the Company. The Company agrees that HT, in the course of its engagement hereunder, will rely entirely upon information supplied by the Company, which information the Company hereby warrants shall be complete and accurate in all material respects and not misleading. The Company also agrees that it shall be solely responsible for the accuracy and completeness of all descriptive material prepared during this engagement concerning the Company.

2. Financial Restructuring – A Financial Restructuring shall be defined as either 1) Confirmation of a Plan of Reorganization under the U.S. Bankruptcy Code or (2) The negotiation and execution of a financing agreement to replace the currently existing bank debt.

3. Fees – The Company shall pay to HT, or cause HT to be paid, for the services rendered under this Agreement, the following cash fees:

    1. a $15,000.00 retainer, payable upon the execution of this Agreement.

    2. $350.00 per hour for services of an HT professional. Each Friday HT will submit an invoice and a summary of hours expended weekly for the period from Friday to Thursday. Invoices will be paid by the following Friday.

    3. an additional fee contingent upon the completion of any Financial Restructuring during HT's engagement period. Such fee shall be $60,000.00 which shall be paid upon the closing of the Financial Restructuring.

4. Expenses – In addition to any fees that may be payable to HT hereunder and regardless of whether any Financial Restructuring is proposed or consummated, the Company hereby agrees, from time to time upon request, to reimburse HT for all fees and expenses of HT's counsel and all of HT's travel and other

out-of-pocket expenses incurred in connection with any actual or proposed Financial Restructuring or otherwise arising out of HT's engagement hereunder.

5. **Termination of Engagement** - This Agreement may be cancelled by the Company or HT at any time with or without cause upon written notice to the other party. Regardless of the date of termination, HT shall be entitled to its full fee described in Section 3 hereof in the event a Financial Restructuring is completed within one year of termination. Sections 4, 6, 7 and 8 (entitled Expenses, Public References, Indemnification and Jurisdiction, respectively) of this Agreement shall survive termination indefinitely.

6. **Public References** - The Company acknowledges that all opinions and advice (written or oral) given by HT to the Company in connection with HT's engagement are intended solely for the benefit and use of the Company (including its management, directors and attorneys) and the Company agrees that no such opinion or advice shall be used, reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose, nor shall any public references to HT be made by the Company (or such persons), without the prior written consent of HT. In addition, the Company agrees that any descriptive material prepared with HT's assistance, including presentation materials, shall not be used, reproduced, disseminated, quoted or referred to at any time or in any manner except with the prior written consent of HT.

7. **Indemnification** - Since HT will be acting on the Company's behalf in connection with this Agreement, the Company agrees to indemnify and hold harmless HT and its affiliates, the respective directors, officers, agents and employees of HT and its affiliates and each other person, if any, controlling HT or its affiliates from and against any and all losses, claims, damages or liabilities (or actions in respect thereof) related to or arising out of any transaction contemplated by this Agreement, the engagement of HT pursuant to this Agreement, or the services performed by HT in connection therewith, and will reimburse HT and any other party entitled to be indemnified hereunder for all expenses (including fees and expenses of counsel) as they are incurred by HT or any such other indemnified party in connection with investigating, preparing or defending any such action or claims, whether or not in connection with pending or threatened litigation, and whether or not HT is a party to such action, claim or pending or threatened litigation.

The Company also agrees that neither HT, nor any of its affiliates nor any director, officer, employee, or agent of HT or any of its affiliates shall have liability (whether direct or indirect, in contract or tort or otherwise) to the Company in connection with any transaction, the engagement of HT pursuant to this Agreement, or the services performed by HT in connection therewith except for any liability for such losses, claims, damages, or expenses incurred by the Company that result directly from HT's gross negligence in performing the services which are the subject of this Agreement.

If for any reason the foregoing indemnification is unavailable to HT or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by HT as a result of such loss, claim, damage or liability in proportion as is appropriate to reflect not only the relative benefits received by the Company on the one hand and HT on the other hand but also the relative fault of the Company and HT, as well as any other relevant equitable considerations. Notwithstanding the foregoing, under no circumstances shall HT's aggregate contribution to any losses, claims, damages and expenses with respect to which contribution is available hereunder exceed the amount of fees actually received hereunder.

8. **Jurisdiction** - This Agreement is being executed by HT in the State of New York, and it is understood that HT will perform its services hereunder in that State. Accordingly, the Agreement and all questions relating to its validity, interpretation, performance and enforcement shall be governed by, and construed, interpreted and enforced in accordance with the internal laws, and not the law of conflicts of law, of the State of New York. The Company hereby irrevocably and unconditionally consents to submit to the jurisdiction of the courts of the State of New York and of the United States of America located in New York County, New York, for any actions, suits or proceedings arising out of or relating to this Agreement or the transactions contemplated hereby (and the Company agrees not to commence any action, suit or proceeding relating thereto except in such courts). The Company further agrees that service of process, summons, notice or document by U.S. registered mail to our address set forth above shall be effective service of process for any action, suit or proceeding brought against the Company in any such court. The Company hereby

irrevocably and unconditionally waives any objection to the laying of the venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby, in the courts of the State of New York or the United States of America located in New York County, New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

This Agreement sets forth the entire understanding of the parties relating to the subject matter hereof, and supersedes and cancels any prior communications, understandings, and agreements between the parties hereto. This Agreement cannot be modified or changed, nor can any of its provisions be waived, except by written agreement signed by both parties. The benefits of this Agreement shall inure to the respective successors and assigns of the parties hereto and of the indemnified parties hereunder and their successors and assigns and representatives, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to HT the duplicate of this letter attached hereto.

We look forward to working with you on this assignment.

Sincerely,

HT CAPITAL ADVISORS, LLC

By: _____
Peter Offermann, Managing Director


**Accepted and Agreed:**
**MANYFOODS, INC.**

By: _____

Title: _____

Date: _____

Debtor:         Manyfoods, Inc.

Case No.:       03-27989 (DHS) (Chapter 11)

EXHIBITS to VERIFIED STATEMENT OF PETER OFFERMANN IN SUPPORT OF APPLICATION PURSUANT TO 11 U.S.C. § 327(a) AND FED. R. BANKR. P. 2014(a) FOR ORDER AUTHORIZING AND APPROVING EMPLOYMENT OF HT CAPTIAL ADVISORS, LLC AS SPECIAL FINANCIAL ADVISORS TO THE DEBTOR AND DEBTOR-IN-POSSESSION NUNC PRO TUNC

# Exhibit B

### PETER OFFERMANN, MANAGING DIRECTOR

---

Prior to affiliating with HT Capital Advisors, LLC, Mr. Offermann was the Chairman and Chief Executive Officer of ATC Group Services, Inc., a national environmental consulting company. This followed five years as the Chief Financial Officer of TLC Beatrice International Holdings, Inc. a two billion dollar sales, international food company. Prior to that, Mr. Offermann spent twenty-five years at New York's Bankers Trust Company and its various affiliates, doing commercial banking, investment banking and equity investment. His career has been spent advising, financing, managing and operating middle market businesses.

While at TLC Beatrice Mr. Offermann was involved in the sale of six food businesses for total consideration in excess of one billion dollars, the issuance and subsequent redemption of publicly traded high yield notes and multiple bank debt financings. While at Bankers Trust Mr. Offermann was involved with public equity issuance, High Yield Debt issuance and advised domestic and international acquirers, on sales of companies, debt restructurings and he handled numerous leveraged buyout transactions. He has served on the Boards of Directors of several private and publicly held companies.

Mr. Offermann holds a BA from Rutgers University and attended the New York University Graduate School of Business. He is a member of the National Association of Corporate Directors and the Turnaround Management Association.

**HT CAPITAL ADVISORS, LLC**

Background Information on:
Peter Offermann
154 North Mountain Ave.
Montclair, New Jersey 07042-2350
973 783 6545
Fax: 973 783 4341
Email: p.offermann@att.net

A skilled financial and operating executive. Has experience in developing and implementing business and financial strategies. Has completed mergers, acquisitions, private and public bond issuance, bank financing, private and public equity issuance and debt restructuring. Increased shareholder value as Chief Financial officer and Chief Executive officer.

Education:    Rutgers University, New Brunswick, New Jersey, BA 1966, Economics
New York University, Graduate School of Business, New York, New York, attended 1969-1976

Employment:    2000-2002: Chairman and Chief Executive Officer, ATC Group Services, Inc., an institutionally owned, $150MM Revenue, national, environmental consulting company.
Restructured senior management, implemented administrative process change, improved quality and timeliness of financial reporting, reduced costs, supported an internal growth strategy. Revenue grew by 12% annually and operating margin improved by 10 percentage points.

1995-1999: Executive Vice President and Chief Financial Officer, TLC Beatrice International Holdings, Inc., a leveraged, European, privately held, $2 billion sales level, branded food manufacturer and retail grocery operation.
Assisted in development of business strategy. Designed and implemented corporate financial strategy, as well as a program for shareholder liquidity. Completed a capital restructuring including issuance of $175MM High Yield Senior Secured Notes, and hedging $200MM of currency exposures. Sold operating subsidiaries in Europe. Reorganized financial office.

1968-1994 Bankers Trust Company and affiliates: a publicly held, New York based, $100 billion total assets, commercial and investment bank

1992-94: Managing Director, BT Investment Partners
Managed and originated investment transactions for BT's equity portfolio. Financially restructured Wickes Lumber Company with an equity IPO, High Yield bonds and a bank facility.

1991-92: Managing Director, BT Securities Corporation
Advised companies on debt restructuring. Advised Kyoei Steel Corp. (Osaka, Japan) on the acquisition of the financially troubled Florida Steel Corporation. This acquisition required the acquisition of common shares and the refinancing; with bank and public high yield bonds, of defaulted bond and bank debt. Dealt with shareholder litigation. This was the largest M&A transaction done by a Japanese acquirer in the United States in 1992.

1990-91: Managing Director
Corporate Finance Generalist in Client Coverage Group managing major investment banking relationships. Advised on the restructuring of DiGiorgio Corporation and the first phase of the financial restructuring of Bally Manufacturing Corporation.

1986-1990: Managing Director
Managed Bankers Trust's Middle Market Commercial Banking, Leveraged Buyout Financing and Investment Banking activities. Established the Division's position of having highest return on assets in the Corporate Finance Department. Handled the Leveraged acquisitions of International Controls Corporation, American Safety Razor, Transway Corporation. Advised and financed, with bank and mezzanine debt, the hostile leveraged acquisition of DiGiorgio Corporation.

1982-1986: Vice President and Division Head
Turned around underperforming Division and bank loan portfolio. Developed strategy for financing small and mid-sized leveraged buyouts, including taking equity participation. Transactions included the buyout of the McCall Pattern Company.

1968-1982: Assistant Treasurer - Vice President
Held a variety of positions of increasing responsibility in Bankers Trust Company's Commercial Banking Group. Involved in business development, credit administration, workouts and management of professional staff. Served the entrepreneurial and middle market business sectors. Doubled profitability of assigned profit center, increased market share, and developed corporate strategy for approaching the small business marketplace. Regarded as a superior manager and developer of personnel.

Memberships    National Association of Corporate Directors
Turnaround Management Association

Peter Offermann
Summary of Board of Directors experience:

- **Wickes Lumber Company**
    - Business Description
        - Chain of wholesale and retail lumber yards
        - Privately held
        - $900 million sales level
    - Years served: 1989-1992
    - Committees: Compensation
    - Board Activities
        - Served following a management buy out
        - Replaced CEO
        - Replaced lead investor
        - Positioned the company for IPO, which was subsequently achieved
        - Left the Board to comply with then existing banking regulations

- **National Auto Finance, Inc.** now known as National Auto Receivables Liquidation, Inc.
    - Business Description
        - Sub-prime automobile finance company
        - Publicly held (NASDAQ)
        - $200 million portfolio
    - Years served: 1996-current
    - Committees: Audit, Compensation
    - Board Activities
        - Company had financial difficulties following its IPO
        - Chaired the Restructuring Committee of the Board
        - Defended shareholder lawsuit
        - All assets have been sold
        - The company is being liquidated

- **Mayor's Jewelers, Inc.**, formerly: Jan Bell Marketing, Inc.
    - Business Description
        - Retail jewelry chain
        - Publicly held (AMEX)
        - $400 million of annual sales at peak size
    - Years served: 1996-2002
    - Committees: Compensation
    - Board Activities
        - As a result of financial reverses in 2001
            - Replaced the CEO
            - Served as non-executive Chairman
            - Involved with capital raising and financial restructuring efforts.
            - New investor secured in August 2002 resulting in change of Board composition

- **Philip Services Corporation**
    - Business Description
        - Recycling and industrial service organization
        - Institutionally controlled
        - $1.5 Billion of annual sales
        - Publicly held (NASDAQ)
    - Years served: 2000-2002
    - Committees: Audit, Corporate Governance
    - Board Activities
        - Supported CEO in strategy disagreements with major shareholder
        - Left the Board in 2002 after that shareholder gained majority control

- **Specialty Piping Corporation**
    - Business Description
        - Manufacturer of flanges and pipe fittings
        - Institutionally owned
        - $100MM (sales level)
    - Years served: 2001-2002
    - Committees: Audit, Compensation
    - Board Activities
        - Served in anticipation of refinancing or sale
        - All assets have since been sold
        - The corporation is in liquidation